We'll hear argument this morning in consolidated cases, No. 13354, Sebelius, Secretary of Health and Human Services v. Hobby Lobby Stores, and 13356, Conestoga Wood Specialties Corporation v. Sebelius. Mr. Clement? Mr. Chief Justice, and may it please the Court, when a federal government agency compelled employers to provide something as religiously sensitive as contraception, it knew that free exercise and RFRA claims would soon follow. In particular, the agency itself provided exemptions and accommodations for the religious exercise of a substance. Is your claim limited to sensitive materials like contraceptives, or does it include items like blood transfusion, vaccines, for some religions, products made of pork? Is any claim under your theory that has a religious basis? Could an employer preclude the use of those items as well? Well, Justice Sotomayor, the first step in the analysis would be to ask whether or not there's a substantial burden on religious exercise. I do think this case is, in a sense, easier than most of the examples that you've brought up, because here's one where it's so religiously sensitive, so fraught with religious controversy, that the agency itself provides a certain number of exemptions and accommodations. So that's one way, I think, that you'd address the first step of the question. Well, I mean, just take one of the things that Justice Sotomayor asked about, which is vaccinations, because there are many people who have religious objections to vaccinations. So suppose an employer does and refuses to fund, or wants not to fund, vaccinations for her employees, what happens then? Well, if we assume we get past the substantial burden step of the analysis, then the next step of the analysis is the compelling interest and least restrictive alternatives analysis. Now, every case would have to be analyzed on its own. I do think in the context of vaccinations, the government may have a stronger compelling interest than it does in this context, because there are notions of herd immunity and the like that give the government a particularly compelling interest in trying to maximize the number of... Blood transfusions? Blood transfusions. Again, each one of these cases, I think, would have to be evaluated on its own and apply the compelling interest, least restrictive alternative test, and the substantial burden test. So really, every medical treatment, and Justice Sotomayor is quite right, that there are quite a number of medical treatments that different religious groups object to. So one religious group could opt out of this, and another religious group could opt out of that, and everything would be piecemeal, and nothing would be uniform. Well, Justice Kagan, nothing could be clearer than when Congress passed RFRA, Congress made a judgment that RFRA was going to apply to all manner of federal statutes. And I think what Congress... Mr. Clement, maybe it seemed clear then, but since RFRA, just as before RFRA, Congress has continued to write into federal legislation specific religious exemptions for some, but not everybody, for individuals, and sometimes religious institutions. So if it was all that clear that RFRA took care of it all, why did Congress continue after RFRA to pass these laws focusing the exemption of individual religious institutions? Those, as I take your argument, all of those laws, and there are more than half a dozen, were unnecessary. Once RFRA was on the books, Congress didn't have to do that anymore. Well, Justice Ginsburg, I'm not sure that they were all unnecessary, and of course, in a variety of contexts, Congress may proceed on a belt and suspenders matter. So I think there's really two different questions. One is, when Congress passed RFRA, was RFRA just done with creating other exemptions? And I think the answer to that is no. But I think the question that Justice Kagan's question brought up is, was Congress evident and did Congress specifically consider whether RFRA would apply across the board to all the provisions of 18 U.S.C., or rather, all the provisions of the United States Code? And Congress could not have been clearer that it was passing a statute that it wanted to apply to all pre-existing statutes and to all subsequent statutes unless Congress specifically provided otherwise. You were beginning by giving us a framework for your argument. Do I think of this as a statutory case? Of course, the First Amendment is on the stage at some point here. But I take it you can prevail just on the question of statutory interpretation. And if that is so, are there any statutory rules that work in your favor? That is to say, avoiding a constitutional question? How do we think about this case, primarily as a statutory case? Obviously, one of my clients has before you right now a free exercise claim. And my other client has a free exercise claim that's live in the lower courts. So those issues are preserved. But I think as your question points out, this Court really, first and foremost, can decide this on the basis of the Federal statute. And the Ashwander principles of constitutional avoidance seem like they would be fully applicable to the Court's consideration of that question. And then, of course, the normal principles of statutory construction would certainly point you to the answer to the first objection the government raises, which is, do persons include for-profit corporations? But, Mr. Clement, isn't this a special kind of statute? Because this is a statute that specifically refers back to a body of constitutional law. It basically says we want to get right back to the place that we were with respect to religious claims before Employment Division v. Smith. And so we have a – it's not – you know, it's a statute that directs us to a body of constitutional law. That body of constitutional law is, I think, very different from the one you portray in your brief. It suggests that accommodations should be made sometimes, but rarely, and subject to a balancing analysis, not to a compelling interest standard in the way we would use it for, say, race discrimination. So, you know, what's the response to that? Well, first, Justice Kagan, let me take a little bit of an issue with your premise, and let me try to be responsive to your question anyways after I do that. How I'd like to take issue with your premise is that when Congress first passed the statute, RFRA, it talked about free exercise as defined in the Court's cases. And then at the time that it passed RLUIPA, which is a later statute, it actually confronted some lower court cases that had limited RFRA and tried to impose a centrality requirement. And Congress didn't want that. It didn't want to take all the baggage of the pre-Smith free exercise cases. So it actually amended the statute to broaden it so it now protects any exercise of religion. So I would take issue with your premise that RFRA simply picks up everything that ever happened pre-Smith. Well, there's another respect in which this, even as originally enacted, does not track the pre-employment division versus Smith law. That is to say, the compelling state interest test in the prior cases was never accompanied by a least restrictive alternative requirement. That was an invention of this law. I think that's fair, Justice Scalia. One of the things that you run into if you try to sort of get at this statute the way that Justice Kagan is suggesting is that not everybody exactly agreed as to what the pre-Smith case law was. You described the pre-Smith case law in your opinion in a certain way. Justice O'Connor described the pre-Smith case law in another way. So it's a little bit difficult to try to say, as Justice Kagan's question would suggest, that rather than just apply the statute as written, we should really sort of just go back and apply pre-Smith law as if it were the case. Well, it is applying the statute as written. The statute as written, this is not a question of legislative history, the statute as written points back to pre-Smith law. It says that's what we mean. Well, you're right, Justice Kagan, in the purpose part of the statute. It says what we mean to do here is basically restore the pre-Smith law. But it also accompanies that purpose statute with operative language. And the operative language, which I think this Court should apply, as Justice Scalia suggests, applies broadly to any exercise of religion by any person, and then suggests that the relevant test is substantial burden with the burden on my client as to the substantial burden part of the test. And then it's — Mr. Clement, this was a law that was passed overwhelmingly. Both houses of Congress, people from all sides of the political spectrum voted for it. It seems strange that there would have been that tremendous uniformity if it means what you said it means, to take — to cover corporate corporations, especially in light of — there was an effort to adopt the Conscience Amendment, the specific Conscience Amendment in 2012, and the Senate rejected that. That amendment would have enabled secular employers and insurance providers to deny coverage on the basis of religious beliefs or moral convictions. It was specifically geared to secular employers and insurance providers. And that was rejected. Well, Justice Ginsburg, I would suggest to the contrary. The reason that there was such unanimity behind RFRA in the first place is that efforts to limit it to just certain subclasses, subsets of religious freedom claims were rejected. And sort of everybody in Congress got together and said, all right, you have some claims that you actually want to be vindicated. You have some claims you want to be vindicated. We'll vindicate all of them. And if we're going to look at any legislative history as shedding light on this, then I would suggest you look at Professor Laycock's brief, which goes into great detail about the legislative debates involved in — that led up ultimately to the passage of RLUIPA. And when Congress was trying to pass a broader statute, the RLPA, the Religious Liberty Protection Act, the issue of the statute's application and RFRA's application to for-profit corporations was squarely put at issue by the Nadler Amendment. And that amendment was rejected. And the House report that demonstrates the rejection of that amendment could not be clear that they understood that for-profit corporations would be covered. Now, in fairness, what they understood is that we were probably talking about in the real world a relatively small set of corporations like an incorporated kosher market or kosher deli of the kind that this Court had before it in the Crown Kosher case. And so I think it's — you know, we can talk about the extent in how you'd apply these principles to Exxon, but I think that's just something that's not going to happen in the real world. It is no accident that the claims that you have before you in these cases are brought by small, closely held corporations that have firmly held religious beliefs. But again, Mr. Clement, as Justice Ginsburg said, this was a very uncontroversial law. And your understanding of this law, your interpretation of it would essentially subject the entire U.S. Code to the highest test in constitutional law, to a compelling interest standard. So another employer comes in, and that employer says, I have a religious objection to sex comes in. I have a religious objection to minimum wage laws. And then another, family leave. And then another, child labor laws. And all of that is subject to the exact same test which you say is this unbelievably high test, the compelling interest standard with the least restrictive alternative. Well, I don't say that. I think Congress said that. But to be as responsive as I can to your question, the parade of horribles that the government offers you ought to sound familiar. Because if you look at that parade of horribles, Social Security, minimum wage, discrimination laws, compelled vaccination, every item on that list was included in Justice Scalia's opinion for the Court in Smith. And Justice O'Connor responded to that in her separate opinion. And she said, look, you've got to trust the courts. Just because free exercise claims are being brought doesn't mean that the courts can't separate the sheep from the goats. Now, whatever — — which was we did a balancing. We looked at the government's interests. We took those very seriously, especially to the extent that there was harm to identifiable third parties and that it fell on an identifiable third party. That was basically — you could not get an accommodation for that kind of harm. Well, what she said, and whatever the merits of it as a matter of a constitutional debate, isn't relevant. What I think is relevant is that Congress clearly preferred one side of that debate and thought courts could handle this. So then the question becomes, how do courts actually apply this test? And I don't think applying the test to recognize this case, where I think the government has an incredibly weak case on compelling interest and least restrictive alternatives, which they almost don't want to talk about at all, is going to endanger any other statutes. And if I could talk about — Justice Clement, in all the years since RFRA has been on the books, have any of these claims involving minimum wage, for example, been brought, and have they succeeded? Justice Alito, very few of these claims have been brought. Very few of them have succeeded. And that's notwithstanding the fact that all of these statutes we're talking about apply to employers generally. And none of those claims have been brought or they haven't succeeded, notwithstanding the fact that the government concedes that sole proprietorships and partnerships and nonprofit corporations are all protected by RFRA. Now, millions of Americans are employed by proprietorships, partnerships, and nonprofits. So if these statutes really were on a collision course, I think we would have seen the collision already. Well, with respect, Mr. Clement, I think that that's probably because the court has had a different understanding of what RFRA does and the kind of analysis that it requires courts to perform than you are arguing for in this case. That if your argument were adopted and there was a strict scrutiny standard of the kind that usually applies and a least restrictive alternative requirement, then you would see religious objectors come out of the woodwork with respect to all of these laws. And because you say that there – and I think this is absolutely right when you say it – that you cannot test the centrality of a belief to a religion. You cannot test the sincerity of religion. I think a court would be – you know, their hands would be bound when faced with all these challenges if your standard applies. Well, Justice Kagan, a couple of thoughts. First of all, I mean, it's not like this Court has never had a RFRA case that it applied the standard on the merits. I mean, in the Ocentro case, this Court applied something that very much felt to the government at the time as being strict scrutiny. It was a religious organization. It certainly was a religious organization, and it's a separate question. This is what's different. I mean, all along, the earlier cases dealt with individuals, and they dealt with religious institutions. Well, if I may, Justice Ginsburg, there's two separate questions. There's the questions about how to apply the test if it's applicable in a particular case, and I think Ocentro is the starting place for guidance on that. Your question also brings up a separate question about the coverage of the statute. And as to that, I think the place to start is the statute itself, which broadly provides coverages to persons. That is not an incidental term. It's a term that picks up additional context through the Dictionary Act and specifically applies to all corporations, to joint partnerships, to societies. How does a corporation exercise religion? I mean, I know how it speaks, and we have, according to our jurisprudence, 200 years of corporations speaking in its own interest. But where are the cases that show that a corporation exercises religion? Well, Justice Sotomayor, those cases – I mean, I'd start with cases like Licumi or Ocentro, which all involved corporations. And nobody thought it was particularly problematic there that the plaintiffs before the court were artificial entities. And I suppose you could take – Well, but they were really arguing about things that affected their membership, not them as a corporate entity. Well, I'm not sure that you can so easily divide the two, and we can talk about how it is with corporations generally. You understand how the corporation has certain beliefs or certain intent, a scienter requirement. The courts every day deal with issues of trying to figure out what kind of intent or motivation a corporate entity has. The dissent in this case, in the Tenth Circuit case, said how do we determine when a corporation has that belief? Who says it? The majority of shareholders, the corporate officers, the – is it 51 percent what happens to the minority? And how much of the business has to be dedicated to religion? Five percent, 10 percent, 90 percent? Well, let's assume not a business like yours. You've picked great plaintiffs, but let's assume – let's assume just a business that sells five percent of religious books, doesn't play Christmas music, doesn't give off works on Sunday, you know, does nothing else religiously. Right, and Justice Sotomayor, I think the way to approach those cases would be the same basic way you approach other questions of corporate intent or corporate motivation. You look to the governance doctrines. If any of this is put at issue, and I think that's really a critical question, which is ultimately I think this line of questioning goes to a question of sincerity, and if some large corporation asserts some claim that's going to save them lots of money, I would think that the government in those kind of cases is really going to resist the sincerity piece of the analysis. In this kind of thing – That's the most dangerous piece. Well, I'm not sure – That's the one we've resisted in all our exercise jurisprudence. To measure the depth of someone's religious beliefs. To be clear, this Court's cases have always distinguished between the sincerity inquiry which the Court has allowed and the centrality inquiry, which is suggested as inappropriate. But sincerity has always been a part of this Court's cases. I thought more importantly was whether a burden was substantial or not, that we've never acceded to the person claiming a religious exemption a belief in how substantial the claim might be. Right. This Court has not questioned that. The Thomas case I think puts us common ground with the idea that you don't really second guess the person's – the person's belief. But you can contest sincerity. It is – there's case law on this. You know, you have people who are arrested in possession of large quantities of marijuana, and they assert that they belong to the church of marijuana. And those cases do get litigated, and they get rejected. And there's a lot of different ways to – Is there a different way of looking at it, the Lee way? In U.S. v. Lee, we said when followers of a particular sect enter into a commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity. So isn't that really the answer, that we've never considered a for-profit corporation as exercising religion? Well, let me take on Lee first. And I mean, that's obviously the two lines of Lee that are the government's favorite two lines in Lee. But Lee starts with a substantial burden inquiry, which is where most of these sincerity questions go. And Lee definitely says that there is a sincere religious belief and a substantial burden on religious exercise. So the two sentences that you're quoting come in the compelling interest analysis of the case. And I think Lee does stand for the proposition that in the tax context, it's going to be very hard for somebody to bring a claim that satisfies even the demanding compelling interest – Well, that's an interesting question, because the briefs on both sides here are written as if the penalty for not having a health insurance policy that covers contraceptives is at issue. But isn't there another choice nobody talks about, which is paying the tax, which is a lot less than a penalty, and a lot less than the cost of health insurance at all? These employers could choose not to give health insurance and pay not that high a penalty, not that high a tax. Well, just to put this in concrete terms, for Hobby Lobby, for example, the choice is between paying a $475 million per year penalty and paying a $26 million per year coverage. No, I don't think that's the same thing, Mr. Clement. There's one penalty that is if the employer continues to provide health insurance without this part of the coverage. But Hobby Lobby could choose not to provide health insurance at all. And in that case, Hobby Lobby would pay $2,000 per employee, which is less than Hobby Lobby probably pays to provide insurance to its employees. So there's a choice here. It's not even a penalty in the language of the statute. It's a payment or a tax. There's a choice. And so the question is, why is there a substantial burden at all? Well, just to be clear, we were talking about the same thing. So the option, the choice, is between paying a $475 million a year penalty and a $26 million a year penalty. That's what Hobby Lobby faces. So $2,000. Sure. No. Paying $2,000 per employee per year if Hobby Lobby does not provide. That's $26 million. You know, Hobby Lobby is paying something right now for the coverage. It's less than what Hobby Lobby is paying for the coverage. There are employers all over the United States that are doing this voluntarily because they think that it's less. I thought that part of the religious commitment of the owners was to provide health care for its employees. That is true, Mr. Chief Justice. If they want to do that, they can just pay a greater salary and let the employees go in on the exchange. Exactly. Which is, by the way, why comparing the $2,000 penalty to the cost of the health care is appalling. It's not called the penalty. It's called the tax. And it's calibrated. And it's calibrated. She's right about that. And it has been treated for some purposes as a penalty. And I think for this purposes, it certainly feels punitive. And if I could finish the thought about why it's a false comparison, the $2,000 penalty to the cost of the health insurance, is that it's going to very much hurt Hobby Lobby if all of a sudden it doesn't provide health care to its employees. And in order to compensate for that, it would have to increase the wages. And I think it would be worse off as a result of this. But if I could also — Well, let's say that that's right. Let's say that they have to increase the wages a little bit. I mean, still, we're talking about pretty equivalent numbers. Maybe it's a little bit less. Maybe it's a little bit more. But this is not the kind of thing that's going to drive a person out of business. It's not prohibitive. It's like the thing that we talked about in Braunfeld, where we said, you know, maybe if the store can't stay open seven days a week, it makes a little bit less money. But so be it, is what we said. No, I actually think what it's like, Your Honor, with all due respect, is like the $5 penalty enforcing the prohibition in Yoder. And what this Court say is, it's one thing if you don't have a direct government prohibition on a religious exercise or a mandate that somebody do something that violates their religion. In those cases, which is like Sherbert and it's like Braunfeld, then you have to look at the substantial pressure and it becomes a little bit more of a loosey-goosey analysis. But when you have a government law that specifically says, you must do something that violates your religion and it's enforced with a penalty, and with all due respect, I think $2,000 straight away is a penalty. But Mr. Clement, it's not saying you must do something that violates your religion. It's giving you a choice. You can do this thing, or if this thing violates your religion, you can do another thing. And that other thing is approximately the same price as the thing that you don't want to do. I don't think it would be the same price at the end of the day. I'd also like to point out how this... Of course it wouldn't be the same price at the end of the day. If they deny health insurance, they're going to have to raise wages if they're going to get employees. It's absurd to say that it comes out of nowhere. Absolutely, Your Honor. And by the way, this $2,000 penalty is very much a double-edged sword for the government. Why is that a problem? Let's assume that the cost of providing insurance is roughly equivalent to the $2,000 penalty. How is the employer hurt? He can just raise the wages. I thought the average price of providing insurance for a single person is $4,000, and it's $12,000 for a family. So the $2,000 tax, that's what it's called, is to help the government provide subsidies to people on the exchange that don't have employer insurance. So it's a tax because it is to do exactly what your client wants, to get the government to supply the contraceptives, not the insurance companies. Here's the problem with this way of looking at it, which is to say whatever it costs per employee to get this health care, that's something that right now Hobby Lobby is paying whatever it's paying them, plus it's, you know, imputed into that is the idea that they're getting their wage and they're getting health care insurance. If they take away the health care insurance, they are going to have to increase the wages to make up for that, and they're going to have to pay the $2,000 penalty on top of it, plus they're going to have to violate their own interest, which is we actually, we believe  The last is important, but just assume hypothetically that it's a wash, that the employer would be in about the same position if he paid the penalty and the employer, pardon me, an employee went out and got their insurance, and that the employee's wages were raised slightly, and that it's a wash so far as the employer is concerned, other than the employer's religious objective, just on the financial standpoint. Can we assume that is hypothetical? Then what would your case be? I think my case would be that in that case, the government might be able to sort of support itself on the compelling interest. I think there would still be a substantial burden on their exercise, but again, this all turns on issues that the government hasn't put an issue. This case hasn't been litigated on this particular theory, so I think I'd love to have the opportunity to show how by not providing health insurance, it would have a huge burden on my client and their ability to attract workers, and that in fact would cost them much more out of pocket. That's not been the nature of the scheme theory. There was a point made earlier, and I think you didn't mean to say this, that provision of health care is not part of their religious belief. Covering their employees for health care, that is not a religious tenet, right? No, it actually is. Again, it hasn't been the principal theory on which this case has been litigated, but if you go back to the complaints and you go back to our briefs, it's part of the religious beliefs of both the Hans and the Greens. They think it's actually important. But Mr. Clement, you're not saying, are you, that their religious beliefs mandate them to provide health care? I thought that you were never making that claim. I didn't have to make that claim in the course of this litigation. What I'm pointing out, though, is for purposes of the substantial burden analysis, it is would not be the only thing that they would lose out if they are on that corner of the dilemma. They would also lose out all the additional wages they would have to pay, and they would be in this position of not offering health care, which is something they believe is important for their religion as well. I'm sure they seem like very good employers, and I'm sure they want to be good employers. But again, that's a different thing than saying that their religious beliefs mandate them to provide health insurance. Because here, Congress has said that the health insurance that they're providing is not adequate. It's not the full package. Well, with respect, what Congress has said is that this kind of plan is not appropriate for a non-grandfathered plan. But if we're going to talk about the government's compelling interests here, which I think has got to be part of the analysis, then I think the grandfathered provisions of this statute really are devastating for the government's argument that it has a compelling interest. When the government pursues compelling interests, it demands immediate compliance. It doesn't say, get around to it whenever it's convenient. I can't imagine Congress passing Title VII and saying, stop discriminating on the basis of race, unless, of course, you have a preexisting policy that discriminates on the basis of race, and then you can keep it as long as you'd like. It is fundamentally inconsistent with a compelling interest analysis to have this kind of grandfathered policy. Well, but I think even that example, you know, initially, Title VII did not apply to any And then gradually, Congress brought the number down, because Congress realized that there were going to be transition issues and that some time was needed to make sure that the compelling interest, you know, should be applied uniformly across all employers. Here's respectfully why I don't think that that works, which is I think the question whenever there are exemptions in a statute is to ask yourself, do the exemptions undermine the compelling interests that the government asserts? There's nothing inconsistent with an interest in prohibiting employment discrimination to say, we're going to focus on the people who actually employ the most people and therefore can engage in the most discrimination. It's quite a different matter, and I don't think anybody would think that Congress would pass a Title VII that said, hey, as long as you have a preexisting discriminatory policy, you're allowed to keep it. That doesn't sound like something that would be consistent. One of the attorneys below on behalf of your clients admitted that the grandfathered policies weren't going to be around very long, because any change to an existing policy, and he said these changes happen on a yearly basis, and we already know from the government statistics that it's up to 40 percent now have grandfathered out. Your own client changed its policy, and that's why it's not grandfathered, and he changed it to drop contraceptives it was covering. And so my point is, since when does a transition's grandfathered exemption, and one that everybody knows will have to change, because premiums by definition will change or co-pays will change, it's a very short transition period. Since when does that prove that the need is not compelling? With all due respect, it's not necessarily a very short transition period, and your references to co-pays and premiums is precisely on point, because the government through its regulations has allowed grandfathered plans to make changes to co-pays as long as they're indexed to medical inflation. Now, if you have a transition period that's just there for a nanosecond, you don't bother indexing it to medical inflation, so this is a grandfathered provision that's going to be around for multiple years, and by the government's own numbers, tens of millions of employees are not getting this mandated coverage as a result of the grandfathered provision. And even if we can project forward 10 years to when maybe there will only be a handful of grandfathered plans, even at that point, you'd still have the same problem that the government would have, which is it has to make an argument for a compelling interest. Just before your time starts to go too fast, how would you suggest that we think about the position and the rights of the employees? And you can have hypotheticals about the employer wants to make them wear burkas and so forth. That's not in this case. But in a way, the employees are in a position where the government, through its health care plans, is, under your view, is allowing the employer to put the employee in a disadvantageous position. The employee may not agree with these religious beliefs of the employer. Does the religious belief just trump? Is that the way it works? Well, no, it's not just the way it works, Justice Kennedy. I actually have four things I'd like to say about that, if it's possible. One is, I think the first thing about third-party burdens is you have to ask where are they coming from. And if the third-party burdens are coming from an employer, I mean, an employer right now can put some burden on their rights because they have to listen to religious music or whatever. That's not as serious as a burden that's coming directly from the government. So that's one principle to think about. Another principle, and this is more of a detail, but I think it's important, is that to the extent you take into account third-party burdens, you take those into account in the compelling interest part of the analysis. The government has an argument that somehow third-party interests go into the substantial burden part of the analysis where we bear the burden, and we don't think that's right at all. But, Mr. Clement, you made the analogy to LUPA. And the one thing that has not been mentioned up till now is the Establishment Clause. The Court was very clear when it came to LUPA, which you said is similar to RIFRA, that the accommodation must be measured so it doesn't override other significant interests. And that was true of Sherbert, and that was true of Eodor. And the Cutter case in this Court made it very clear that the accommodation has to be balanced, and you have to take into account other significant interests. Right. But that actually brings me to my third point, which is those other significant interests that carry the most weight have to be independent of the very statute that's at issue in the case and that the party seeks an exemption from. So if you think about the Kaldor case, there the Court was concerned with the third-party burdens on, say, an employee who had a seniority right to take the weekends off. So he or she had an independent right to take the weekend off, and the government policy was coming in and displacing this. I'm not sure that that squares with Lee. The statute created the right to Social Security, and there the Court said you can't deprive employees of a statutory right because of your religious beliefs. So Lee is contrary to the point you're making. There, too, I have to respectfully disagree, because if you remember the facts of Lee, Lee is brought not just by the employer but by the employee. So the particular employees there don't have a beef with what he's doing at all. And I think when they're talking about third-party burdens there, what the Court's really talking about is the burdens that everybody else who contributes into a system where uniformity, to use the Court's words, was indispensable. And so if I could, though, I think just to illustrate why it's sort of double-counting to count the mandated issue here as being what gives the burden to the third party or the benefit on the third party, imagine two hypotheticals. One is Congress passes a statute and says, I have to destroy all of my books, including my Bibles. Another statute, Congress comes in and says, I have to give all of my books, including all of my Bibles, to you. Now, in the second case, I suppose you could say that a RFRA claim somehow gets rid of your statutory entitlement to my Bibles. But I don't think, since it's the very benefit that we're talking about that's at issue there, I don't think that really is double-counting. And I don't think those two hypothetical statutes should be analyzed any differently. The other thing, though, about burdens, and I think that should go into the — this is a fourth point — that should go into the compelling way of saying that you think that this isn't a good statute because it asks one person to subsidize another person. But Congress has made a judgment, and Congress has given a statutory entitlement. And that entitlement is to women and includes contraceptive coverage. And when the employer says, no, I don't want to give that, that woman is quite directly, quite tangibly harmed. Well, Justice Kagan, I think you could say the same thing about my Bible hypothetical. But I do have one last thing to say about burdens. And I do think when you think about impacts on third parties, not all of these burdens are created equal. And that, too, I think is borne out in this Court's cases. And the most relevant factor is, is there some alternative way for the government to ameliorate the burden? And I think about two types of kind of accommodations, if you will. You've got sort of Title VII with a very narrow accommodation. And then you have conscience clauses that allow medical providers, including for-profit medical providers, not to provide abortions. Now, each of those has a burden on third parties. But I would respectfully suggest they're different. In the case of the employee who's been subject to racial discrimination, even if they can get another job, that racial discrimination is a unique injury to them that you can't remedy unless you tell the employer, don't discriminate on the basis of race. Now, in the context of the conscience clause, if a woman can't get an abortion from her preferred provider, that's surely a significant burden on her. But we don't view that as trumping the conscience clause because she can get the abortion through another mechanism. Here, as your question rightfully highlights, all we're really talking about is who's going to pay for a subsidy that the government prefers. This is not about access to the contraception. It's about who's going to pay for the government's preferred subsidy. And I think in that context, there are ample alternative ways to address any burdens on third parties. And that goes right into the legal... Do you realize it would make no difference if there were 20 FDA-approved contraceptives, all of them covered by the Health Care Act? I think... You picked out, in one case, what, three, and in the other case, four? Well, suppose the employer says, contraceptives altogether are against my religion, so I'm not going to give any contraceptive coverage. Well, obviously, Justice Ginsburg, I didn't pick these out. I mean, my clients and their religious beliefs identified these as problematic. But your argument, it seems to me, would apply just as well if the employer said no contraceptives. I think that's a fair point, Justice Ginsburg. And the government's own accommodations, where they offer them to religious groups and religious employers like nonprofit hospitals, also applies to whatever the religious beliefs of that provider are. So if they extend to all 20, then the exemptions apply to all 20. If they only extend to four, then the exemption applies to all four. Are there ways of accommodating the interests of women who may want these particular drugs or devices without imposing a substantial burden on the employer who has a religious objection to it? There are ample less restrictive alternatives, Your Honor. And I think they all flow from this fact that this is ultimately about who's going to... Those are alternatives that you're asking the government to incur or the person to incur. I mean, there isn't an alternative that doesn't put a cost on someone else. Well, it's funny about this particular mandate, because the government's position is this is actually a cost-free mandate, that whatever you pay out in contraceptions, you're going to make up in not having to pay for other coverages. And so one alternative, one less restrictive alternative, is what's done in the accommodation for nonprofit employers like hospitals, where basically they tell the insurance carrier or the plan administrator that you pick up the cost for this, and then essentially it will be cost-neutral from you. But I don't think there's anything sort of sacrosanct, if you will, about having the government pay for its preferred subsidy as a less restrictive alternative. And that's essentially what the government does for those employees who have employers under 50 employers. If those employees — if the employer doesn't provide health care, those employees go on to the exchanges with a subsidy from the government. And they can do the same thing for objecting religious employers. They just have chosen not to, if I reserve my time. Thank you, Mr. Clement. General Verrilli. Mr. Chief Justice, and may it please the Court, the touchstone for resolving this case is the principle Justice Jackson articulated in Prince v. Massachusetts. As he said, limitations which of necessity bound religious freedom begin to operate whenever activities begin to affect or collide with the liberties of others or of the public. Adherence to that principle is what makes possible the harmonious functioning of a society like ours, in which people of every faith live and work side by side. That's a statement that is inconsistent with RFRA, isn't it? No. The whole point of RFRA is that Congress wanted to provide exceptions for the religious views of particular — including proprietors, individuals. No, Mr. Chief Justice, I don't think so at all. In fact, although that was, of course — I was referring to Justice Jackson's words for their wisdom, because it wasn't the opinion of the Court. Yeah, but the wisdom you cited is the idea that you don't have imposed on the basis of religious beliefs exemptions or limitations. And it seems to me that was the whole point of RFRA, to tell the courts that that is exactly what you should do unless the exception satisfies the strict scrutiny. Well, but I think — well, unless it satisfies the pre-Smith standards under the Establishment Clause. But I do think that the exact same — More than pre-Smith. I take your point about less restrictive means, Your Honor. But the exact same point that Justice Jackson made in Prince, I submit, is the point that this Court made unanimously in Cutter. It's not — it's that when you are analyzing what is required under RFRA, the Court must take account of the way in which the requested accommodation will affect the rights and interests of third parties. Well, is it your argument that providing the accommodation that's requested here would violate the Establishment Clause? It's not our argument that it would violate the Establishment Clause, but it is our argument that in any RFRA case, including this one, you have to consider the impact on third parties, because otherwise you will be skating on thin constitutional license. And so, Justice Kennedy, you asked about principles that surround statutory construction. Avoidance is one of them. And that was why the Court unanimously in Cutter said that in every RFRA case, when you're considering an accommodation, you have to weigh the effect on third parties. Where is that in RFRA? I mean, what factor of RFRA do you fold that in under? Is that part of the compelling State interest requirement or substantial burden requirement? Where is it in RFRA? I think the answer is that it could inform every operative provision in RFRA. We have said that it should inform the Court's interpretation of who counts as a person. If they wanted you to balance the interest of the religious objector against the interest of other individuals, they made no reference to that in RFRA at all. They said unless the government has a compelling State interest. And the compelling interest analysis certainly does require consideration of the interest of third parties. Of course, what the Congress said in RFRA in explaining how the compelling interest test was to work was that it was to strike a sensible balance between claims for religious liberty and governmental interests. And, of course, Lee is one of the pre-Smith cases that provides the governing law. And I would submit it is really the only case from this Court in which the request for an exemption under the Free Exercise Clause had the effect of extinguishing a statutorily guaranteed benefit. Because in Lee, had the employer gotten the exemption from providing Social Security, the consequence would have been that the employees would have been disqualified from receiving Social Security benefits. That wasn't the basis for denying the claim. The basis was that the government has to run a uniform system that applies to everybody. And you can't argue that here because the government has made a lot of exceptions. First of all, I disagree with respect to Lee. One of the points that the Court made in Lee was that granting the exemption from Social Security taxes to an employer operates to impose the employer's religious faith on the employees. It was one of the grounds of decision. Now, but turning to it, I would like to address these exemptions. I'm happy to talk about them. I'm happy to talk about our compelling interest at length. The — Well, maybe you could start with the question of whether the companies in this case have a right to bring refer claims because they're for-profit corporations. You argue that they can't. That's correct. Now, why is that? Is it your position that there's something about corporate form per se that is inconsistent with a free exercise claim? No, because obviously churches can bring them. All right. But is it your argument that there's something about engaging in a for-profit activity that is inconsistent with a free exercise claim? Yes. And if I could walk through the — let me — if you don't mind, just walk through the analysis of it. Well, were the merchants in the Brownfield case engaged in for-profit activity? Yes. So there isn't anything inherent in participating in a for-profit activity that's inconsistent with the corporate form, is there? I'm sorry, with a free exercise claim. Yes. But I think the relevant question is what did Congress think it was doing when it enacted RFRA in 1993? What kinds of claims — Well, what is it about a for-profit corporation that is inconsistent with a free exercise claim? Do you agree with the proposition that was endorsed by one of the lower courts in this case that for-profit corporations must do nothing but maximize profits? They cannot have other aims, including religious aims. No, but here's how we look at it. At its core — I'm sorry, General. You answered yes to Brownfield. It was Jewish merchants, but it was the merchants themselves, the individuals, not the corporation that was going to be jailed. Yes, but I understood Justice Alito to be asking me not about the corporate form but about the activity. And when you have an individual, you have an individual. So whether it was a merchant that was a corporation or not was irrelevant. It was that the individual was going to be jailed. It was an individual making a profit. Certainly. He was running a business for a profit, and that was the point of Justice Alito's question, right, which I think you understood. And I did try to answer, yes. But let me say that I think the relevant question here is what did Congress think it was doing in 1993? And I think the answer to that has to be informed — you know, we understand the Dictionary Act provides a broad definition of person. But the Dictionary Act doesn't define exercise religion. And the operative statutory language is person's exercise of religion. And so you can't look to the Dictionary Act to define that. But Congress told you where to look. It told you to look to the pre-Smith case law. Well, why did it say that? It changed the definition at the time when RLUIPA was adopted. They did not eliminate the reference to the First Amendment. Isn't that right? Yes, but the difference there was to say it didn't want courts to get involved in the entangling enterprise of deciding what was a central belief versus what was a — Well, it says free exercise. And didn't it also adopt a provision in RLUIPA saying that the exercise of religion was to be interpreted in the broadest possible way? Well, I think it said something more precise than that, which was that it was to be interpreted not to be confined only to central religious tenets. Now, didn't it say — didn't it say the term religious exercise includes any exercise — yes, includes any exercise of religion, but it doesn't define what that is. It just says you don't draw a line between centrality and something that may be peripheral. There's another provision that says that this chapter shall be construed in favor of a broad protection of religious exercise to the maximum extent permitted by the terms of this chapter and the Constitution. Right. And it — but with respect to what exercise religion means, it said don't draw lines between centrality and non-centrality. It didn't go beyond that and tell you what it means. And what Riffith tells you to look to is pre-Smith case law. And in the entire history of this country, there is not a single case in which a for-profit corporation was granted an exemption. Not a single case in which it was denied an exemption either. All you're saying is there are no cases. Well, Lee was certainly a case in which a for-profit enterprise was denied an exemption. Brownfell was such a case. Gallagher was such a case. Not on the ground that it was a for-profit enterprise. There's not a single case which says that a for-profit enterprise cannot make a freedom of religion claim, is there? There's not a single case holding that except that in Lee it was critical to the court's analysis that Mr. Lee and his business had chosen to enter the commercial sphere. Isn't that a merits question, General? I mean, I totally understand that argument as an argument about the merits. I'm not sure I understand it as a threshold claim that the claim is not cognizable at all. I do want to move to the compelling interest analysis, but if I could make one point in response to Your Honor's question. The court's got to decide what a person's exercise of religion means. And that it seems to me that it would be such a vast expansion of what Congress could have thought it was doing in 1993 when it enacted RFRA to say that for-profit corporations can make claims for religious exemptions to any laws of general application that they want to challenge. You know, Mr. Clement says, well, you don't have to worry about anything other than small, tightly knit corporations like the one at issue here. I take the point of the appeal of a situation like this one, but the way in which he suggests that you will be able to distinguish this case from a case in which a large corporation comes in or a public company comes in is that you will have more grounds to question the sincerity of the claim. But that raises exactly the kinds of entanglement concerns that this Court has always said you should try to avoid. Well, that's his argument for distinguishing it. But there are others, including the fact that it is more, you avoid all the problems with what to do if it's a, you know, there's a 51% ownership, if you simply say that it's in this type of Chapter S corporation that is closely held. Whether it applies in the other situations is a question that we'll have to await another case when a large publicly traded corporation comes in and says we have religious principles, the sort of situation I don't think is going to happen. But even with respect to these companies, Your Honor, what are you going to do if there's a dispute between, say, the three shareholders, a dispute between two in the majority and one in the minority? You're going to have to get yourself involved and the courts will have to get themselves involved in all kinds of matters. Whoever controls the corporation. Whoever controls the corporation. And the minority shareholder will say, well, this is under state law. This is an act of oppression. And this isn't. That's a question of state corporate law. It's not a question of who can bring an action on the riffraff. But I just raised eight courts of appeals. Every court of appeal to look at the situation have held that corporations can bring racial discrimination claims as corporations. Now, does the government have a position on whether corporations have a race? Yes, we think those are correct and that this situation is different. So that a corporation does have a race for purposes of discrimination. Not that the corporation has a race, but that corporations can bring those claims. But that you're not interpreting in that situation, all you're interpreting is the word person in the statute, not exercise of religion, which is what makes it different. So those cases involve construction of the term person. Yes. So the person, a corporation can bring as a person a claim of racial discrimination. That's correct. But not exercise of religion. That's the difference. But let me, if I could, we think that part of the problem here, and the reason we make the argument we do at the threshold about why you ought not recognize claims under Riffraff for for-profit corporations, is that they are going to predictably give rise to the kinds of issues you have in this case in which the exemption is going to impose a burden on third parties or extinguish rights of third parties, employees or others. And that really can't be what Congress was thinking about. If you say they can't even get their day in court, you're saying something pretty strong. And I understand. But if Your Honor disagrees with me, if the Court doesn't agree with this position at the threshold, the same considerations with respect to the harms of third parties definitely play into the compelling interest analysis. In fact, under Riffraff, the standard, the precise standard that the statute says the government must meet is that it must show that the application of the law to the particular parties here, Conestoga and Hobby Lobby, is in furtherance of the government's compelling interest. That's the test. So the question here is whether having Hobby Lobby and Conestoga provide this coverage is in furtherance of the government's interests in ensuring that this kind of preventive service coverage is available, and in particular the contraceptive coverage that's included within it. Is it your position that part of the compelling interest here is that you have to protect the integrity, the operational integrity of the whole act? It is part of our argument, absolutely. Does that mean that the constitutionality of the whole act has to be examined before we accept it? Well, I think it has been examined, to my recollection. But with respect to that, there is a particularized interest here in that what we are talking about is a question of whether 14,000 employees and their families get access to this contraceptive coverage. But you have exempted a whole class of corporations, and you've done so, under your view, not because of RFRA. So let me go to that. What kind of constitutional structure do we have if the Congress can give an agency the power to grant or not grant a religious exemption based on what the agency determines? I recognize delegation of powers rules are somewhat more abundant so far as that enforcement in this court. But when we have a First Amendment issue of this consequence, shouldn't we indicate that it's for the Congress, not the agency, to determine that this corporation gets the exemption in that one, and not even for RFRA purposes, for other purposes? Your Honor, I do think that it was appropriate for the agency in exercising its delegated authority here to take into account the special solicitude that under our constitutional order churches receive. And it's important to understand, I want to walk through this question of exemptions very carefully, because I think there's a lot of confusion here that needs to be cleared up. But all that the government has done is say that churches, because of that special solicitude, which the Court recognized in Hosanna-Tabor, churches get an exemption. The nonprofit religious organizations don't get an exemption. There's an accommodation there provided, but that accommodation results in the employees receiving access to the contraceptive coverage. So that doesn't diminish the government's compelling interest. The Tenth Circuit and my friends on the other side have relied on this idea that employers with fewer than 50 employees are somehow exempt. But you gave this exemption, according to your brief, without reference to the policies of RFRA. What were the policies that you were implementing? Well, with respect to — as I said, with respect to the churches, it was the special solicitude that churches receive under our Constitution, under the First Amendment. But now with respect to the employers 50 and under, it's just not right to say that there's any kind of an exemption. If they offer health insurance, they're subject to exactly the same per-employee, per-day penalty as larger corporations, exactly the same risk of Labor Department enforcement, exactly the same risk of an arrested suit by the plan beneficiaries. There is no possible way to look at the statutory scheme and conclude there's an exemption there. What about — what about the grandfathered plans? Let me talk about the grandfathered plans. Well, just before you get started, one thing I'd like you to address. The dispute arose with Mr. Clement about how long they were going to be in effect. Can you make a representation to us about how long the grandfathering is going to be in effect? I can't give you a precise figure as to — there's a clear downward trajectory. There's significant movement downward every year in the numbers. There's every reason to think that's going to continue. I can't give you a precise time. Can you give me an approximate time, if not a precise one? I can't give you a representation of exactly how low that number is going to go and exactly how long it's going to take. But I think what you're talking about is a period in which that number is going to go to a very, very low level over a several-year period. Well, if you can't tell us — and I don't fault you for not being able to tell us — when the grandfathering is going to end, shouldn't we assume in our analysis that it is current and, as far as we can tell, not going to end? No, I don't think that's right, Your Honor. I mean, I think let's look at this, if we could, in total, that with respect to grandfathering, it's to be expected that employers and insurance companies are going to make decisions that trigger the loss of that so-called grandfathered status under the governing regulation. Isn't it true with respect to the grandfathered plans that the regulations required immediate compliance with certain requirements, but not with the preventive care requirements? Isn't that right? Let me read you what HHS said in the regulation. With certain particularly significant protections, particularly significant protections, Congress required grandfathered health plans to comply with a subset of the Affordable Care Act's health reform provisions. On the other hand, grandfathered health plans are not required to comply with certain other requirements of the Affordable Care Act, for example, the requirement that preventive health services be covered without any cost sharing. So isn't HHS saying there, quite specifically, these, in our view, are not within this subset of particularly significant requirements as to which there must be immediate compliance? Well, the question would be whether there's a compelling interest in compliance with these requirements. And I'd like to make two points in response to Your Honor's question. First, with respect to this issue of delay, which I think, Mr. Chief Justice, your question raised and my friend on the other side has put a lot of weight on, I'd refer the Court to the ADA. I don't think anybody would doubt that the Americans with Disabilities Act advances interests of the highest order. When Congress enacted that, it put a two-year delay on the applicability of the discrimination provision. Well, isn't that because you're talking about building ramps and all things like that? No, Your Honor. And there's an even longer delay with respect to those kinds of provisions. But it's just a basic prohibition on discrimination, two-year delay, and no one would doubt there's a compelling interest here. And take Title VII. My friends on the other side have said, well, this is different because there's so many more people who are going to not have this coverage under the grandfather plan. But with respect to Title VII, of course, it's still the case that employers with 15 or fewer people are not subject to that law. And that's 80 percent of the employers in the country. And if you run the math, that's at least 80 percent. It's going to be somewhere between 10 and 22 million people who are not within the coverage. No one would say that because the coverage is incomplete in that respect, that Enforcing Title VII doesn't advance it. Those were decisions that Congress made, right? Yes. Well, the grandfathering is not a decision that Congress made, is it? Well, the way in which it's implemented is a decision that the agency has made. That's true. But even with respect to the preventive services, I don't think anyone would say that there's not a compelling interest in advancing colorectal cancer screening, immunizations, and the things that the preventive services provisions provide in addition to contraceptive coverage. I just think this is a compelling interest under any understanding of the term. I just want to make sure you get to this point. And my question reflects no point of view at all on my behalf. I took Mr. Clement's one of his points, which I thought was an important one. He says, there are some people here who strongly object to helping with abortions, which include abortifacient contraceptives. Everybody says, yes, they do object to that. That's sincere. He's not saying this, but I might. But there is a compelling interest in women's health and in the health of the family. And they're not having a religious objection to taking it. And so the government has said, provide it. Then he says, but there is a less restrictive way. And the less restrictive way is the government pays for it. He says, it wouldn't cost much. You'd have to have another piece of paper that would go to the insurance company that would say, insofar as your employer has a sincere objection against paying this, the government will pay for it. Now, what I want to hear, and this is not coming from any point of view, I want to hear your precise answer to that kind of argument. Yes. They did argue, I will point out, for the first time at the podium this morning, that a less restrictive means would be to extend the accommodation. I'm not interested in whether they made the argument sooner or later. What I want to hear from you is I want to hear, and it's not a, you've thought about this. I want to hear your answer to that kind of argument. Well, I want to be sure you have the chance to get it. The answer, I think there are two answers to it. Assuming it's before the court, and I'm going to answer your honest question directly, but I do want to make a prefatory point here, which is that under the law, under Ashcroft v. ACLU, for example, the burden on the government is to show that proposed less restrictive alternatives are not equally effective. If they don't propose it, we don't have a burden to refute it. Having said that, we can refute it. And there are two ways. The first is they claim that they don't think that the accommodation is a less restrictive means, I take it, because, or they haven't raised it before today, because they believe that RFRA would require exemptions to that too, such that if you were to provide the accommodation in which the insurance company comes in and provides the contraception if the employer signs the form, they would say that signing the form also makes them complicit in the sinful activity, and that, therefore, RFRA provides an exemption there too. And, of course, the test is whether the proposed alternative advances the government's interest as effectively. And if it is going to be subject to exactly the same RFRA objections by exactly the same class of people asking for it, it's not going to serve the government's interest as effectively because the RFRA exemption will result in no coverage there. The second point being that there — So don't make them sign a piece of paper. So whether they sign the piece of paper or not, if they make the RFRA claim there, which they have with respect to that accommodation, it will result in it being less effective in terms of accomplishing the compelling interest. In addition — Well, we can ask Mr. Clement what his position is on this. But you say they have already asserted that it would be inconsistent with RFRA as they understand it to provide for a for-profit corporation like the ones involved here the sort of accommodation that HHS has extended to so-called religious nonprofits, perhaps with the modification that was included in our stay order in the Little Sisters case. Yes. Have they taken a position on that? You'll have to ask them. I don't think they have. But they have studiously avoided arguing this is a less restrictive alternative. And I take it it's because their theory, at least, would lead one to the conclusion you have to provide a RFRA objection. But now the second — Yes. Thank you, Mr. Chief Justice. The second point is that you're talking about a very open-ended increase in the cost to the government. Now, we don't know how much that cost would be. The reason is because since this wasn't litigated in the lower courts, there's not a record on it, so I can't tell you what that increased cost is going to be. You're talking about, what, three or four birth control, not all of them, just those that are abort or facient. That's not terribly expensive stuff, is it? Well, to the contrary, and I have two points to make about that. First, of course, one of the methods of contraception they object to here is the IUB, and that is by far and away the method of contraception that is most effective but has the highest up-front cost and creates precisely the kind of cost barrier that the preventive services provision is trying to break down. I was taken by your answer. I thought it was the government's position that providing coverage for the full range of contraceptives and other devices and drugs that are covered here is actually financially neutral for an insurance company, that that reduces other costs that they would incur. It is for the insurance company, but for the woman who's going to not get the benefit of the statute if the exemption is granted. No, no, if she has the coverage through the insurance company, but the employer has nothing to do with arranging for that. Well, so in other words, if they haven't raised a RFRA objection to the alternative, but as I said, the logic of their position is that you would get a RFRA objection. I want to press this a little further, and I don't want you simply to just agree with what I'm about to say. Don't worry. No, I mean, after all, somebody, a taxpayer might say, I don't want to pay for this small ward. And it would be a religious ground, and it would be very, very little money, in fact, that you'd take from him. Or the church might say, I want a Sunday morning reduction in the cost of municipal parking. And by the way, that will not only not cost the government anything, they'll make money because nobody parks there on Sunday, particularly with this high a fee. I'm trying to figure out where this case fits in that spectrum, because I think the answer to the first two questions is no. And I know, so you're just going to agree, and that's what I don't want. I want to understand your thinking on the point. On that point, I think that question plugs into our view of what the substantial burden test requires, that their view of substantial burden is if you have a sincere religious belief and there is any law with a meaningful penalty that imposes on you pressure to do something inconsistent with your belief, then you may pass the substantial burden test. I think the problem with that test, as they formulated, is that under the two hypotheticals that you just gave, Justice Breyer, you've got a substantial burden in those situations, because if you don't pay the tax, you can go to jail, for example. And so we think that substantial burden analysis has got to be more strenuous than that. It's got to incorporate principles of attenuation and proximate cause, and that when you think about this case where the requirement is to purchase insurance, which enables actions by others, that you're really closer to the tax situation than to imposing a direct obligation to act. So that's how we would think about that issue. But now with respect to General Verrilli, isn't that really a question of theology or moral philosophy, which has been debated by many scholars and adherents to many religions? If A does something that B thinks is immoral, how close a connection does there have to be between what B does that may provide some assistance to A in order for B to be required to refrain from doing that action? It's true that it's a difficult question. But it is a religious question, and it's a moral question. You want us to provide a definitive secular answer to it? No, but I do think the problem, Justice Alito, is that this Court has recognized and certainly the courts of appeals have recognized that there is a difference. You accept the sincerity of the belief, but the Court still has to make a judgment of its own about what constitutes a substantial burden, or otherwise, for example, the tax thing would be a substantial burden. We cited a D.C. Circuit case in which prisoners objected to giving DNA samples, and the Court said we accept the sincerity of that belief, but it's up to us to decide whether that's actually a substantial burden. In the Bowen case in this Court, the Court accepted the sincerity of the belief that the use of the child's Social Security number would offend religious belief and commitments, but said they still had to make a judgment about whether that was a substantial burden. So it does have to be, with all due respect, part of the analysis. I still don't understand how HHS exercised its judgment to grant the exemption to nonreligious corporations if you say it was not compelled by RFRA. Then it must have been because the health care coverage was not that important. It didn't grant an exemption to any nonreligious organizations, Justice Kennedy. It granted an exemption to churches, and that was it. With respect to religious nonprofits, it constructed an accommodation, but the accommodation delivers the contraceptive coverage to the employees of the nonprofits. It just does it through an indirect means. But there is no diminution of the— there's no basis for questioning the government's interest with respect to that accommodation because the employees get the coverage just as that would. But that, of course, is an issue that's being hotly litigated right now, right? Whether the employees can get the coverage when you're talking about religious organizations. Well, that's exactly why I think you can't look to that as a less— that accommodation, extending that accommodation to for-profit corporations as a less restrictive alternative precisely because it's being hotly litigated, whether RFRA would require exemptions to that. But you're relying on it to make your point with respect to the accommodation, and then you're criticizing your friend for relying on the same thing and making his point. Well, I think that the—I think what Justice Kennedy— I took Justice Kennedy to be asking me, Mr. Chief Justice, was whether the government's choice to provide that accommodation reflected a judgment on the part of the government that this was something less than a compelling interest. And I don't think that inference is possible because the government was trying to use that accommodation to ensure that the contraceptives were delivered. So with all due respect, I don't think there's an inconsistency there. And I do think, if I could, with respect to this issue of whether there are exemptions that defeat a compelling interest, that I submit would be a very dangerous principle for this Court to adopt in a form that my friends on the other side have offered it, because not only would you then be in a position where it would be very hard to see how Title VII enforcement could be justified by a compelling interest in response to a RFRA objection, ADA enforcement, FMLA enforcement, all kinds of things. And I do think— Except Title VII was passed before 1993, so that wouldn't apply— RFRA wouldn't apply to Title VII. Well, I think—with all due respect, Justice Ginsburg, I think you could claim a RFRA exemption from Title VII. And the problem here would be that— and I think one of the things that's significant about the position that my friends on the other side have taken here is that with respect to exemptions, for example, from the Title VII requirement against discrimination on the basis of religion and hiring, Congress made a quite clear judgment to provide a very narrow exemption, churches and religious educational institutions and religious associations. And that's it. Nobody else can claim an exemption under Title VII— Except that they passed RFRA after that. That made a lot of sense. But the question is, they passed RFRA after that. Well, I think the further question, Your Honor, is whether you would interpret RFRA in a manner where you would essentially obliterate that carefully crafted— where what Congress meant to do was to obliterate that carefully crafted exemption and instead say that every for-profit corporation— Well, if Congress feels as strongly about this as you suggest, they can always pass an exemption to—exception to RFRA, which they've done on other occasions. They haven't done it here. Well, with all due respect, Your Honor, I think you could make the same argument either way in this case, that the question here is what Congress thought it was doing in 1993. And we don't think, given the long history and the fact that not only do you have no case in which a for-profit corporation ever had a— Well, we've already discussed that. There's no case holding that they can't, right? In addition, if you look at the history of exemptions and accommodations in our legislation, state and federal legislation, they extend to churches and religious nonprofits and individuals. And that's where the line has been drawn in our legislation historically. There just is nothing in our tradition that says— Under your view, a for-profit corporation could be forced in principle— there are some statutes on the books now which would prevent it— but could be forced in principle to pay for abortions. No, I think, as you said, the law now is to the contrary. But your reasoning would permit that. Well, I think that—I don't think that that's—  It certainly wouldn't be true, I think, for religious nonprofits. It certainly wouldn't be true for a church. No, I'm talking about for-profit corporations. You say for-profit corporations just don't have any standing to vindicate the religious rights of their shareholders and owners. Well, I think that if it were a for-profit corporation and if such a law like that were enacted, then you're right in our theory that the for-profit corporation wouldn't have an ability to sue. But there is no law like that on the books. In fact, the law is the opposite. I'm sorry, I lost track. There is no law on the books that does what? That makes a requirement of the kind that Justice Kennedy hypothesized. The law is the opposite. Well, flesh it out a little more, right? There's no law on the books that does what? That requires for-profit corporations to provide abortions. Isn't that what we're talking about in terms of their religious beliefs? Their religious beliefs is that they have to pay for these four methods of contraception that they believe provide abortions. I thought that's what we had before us. It is their sincere belief, and we don't question that. But I will say, and I do think this is important, and I say it with all respect, that that is the judgment that they make. It is not the judgment that federal law or state law reflects. Federal law and state law, which do preclude funding for abortions, don't consider these particular forms of contraception to be abortion. With all due respect, I would say that I think that, you know, you've got about 2 million women who rely on the IUD as a method of birth control in this country. I don't think they think that they are engaged in abortion in doing that. It is their belief. It's sincere. We respect it. But it isn't a belief that we think is reflected in federal or state law or our traditions of where that line is drawn. And so, and I do think that that is what makes this a difficult case. I agree. And if you disagree with our position at the threshold that corporations, that even though you have a situation, and we acknowledge you can have situations, in which a tightly knit group, a small group of tightly knit individuals own and operate a corporation where there is appeal to that, to the argument that they ought to recognize a claim of exercise of religion in those circumstances. The problem I would submit is with the implications of doing it, the implications for entanglement and making the judgments when you move past that group, the administrability problems, and the problems of inviting the kinds of claims that are predictably going to impose harms on third parties. What about the implications of saying that no for-profit corporation can raise any sort of free exercise claim at all, and nobody associated with the for-profit corporation can raise any sort of free exercise claim at all? Let me give you this example. According to the media, Denmark recently prohibited kosher and halal slaughter methods because they believe that they're inhumane. Now, suppose Congress enacted something like that here. What would a corporation that is a kosher or halal slaughterhouse do? They would have no recourse whatsoever. They couldn't even get a day in court. They couldn't raise a RFRA claim. They couldn't raise a First Amendment claim. Well, I'm not sure they couldn't raise a First Amendment claim, Justice Alito. I think if you had a targeted law like that that targeted a specific religious practice, that I don't think it is our position that they couldn't make a free exercise claim in that circumstance. And so why is that— You're getting away from a hypothetical. Say Justice Alito's hypothetical was that the impetus for this was humane treatment of animals. There was no animus to religion at all. Which is the Church of Lukumi, there was an animus to the religion. So we're taking that out of the hypothetical. Right. Well, I think if it were targeted only at the practices of the kosher and halal practices, then I think you would have an issue of whether it's a targeted law or not. But even if it is— Well, no, they say no animal may be slaughtered unless it's stunned first, unless the animal is rendered unconscious before it is slaughtered. Well, I think in that circumstance you would have, I think, an ability for customers to bring suit. I think you might recognize third-party standing on behalf of the corporations, on behalf of customers, so a suit like that could be brought. But even if you disagree with me at the threshold, even if you disagree with us with respect to the kinds of risks that we think you will be inviting if you hold that for-profit corporations can bring these claims, when you get to the compelling interest analysis, the rights of the third-party employees are at center stage here, and I think that's the point of critical importance in thinking about this case. And I think, frankly, the point that has been just left on the sidelines by my friend on the other side, the consequence of holding here that a RFRA exemption applies, it's not a situation like ones in which this Court, under the Free Exercise Clause or under RFRA, have recognized exemptions in the past. Those have always been situations where it's a relationship between the individual and the government, and granting the exemption might result in the government not being able to enforce the law with respect to the individual. I mean, the point that Justice Alito is making is that take five Jewish or Muslim butchers, and what you're saying to them is if they choose to work under the corporate form, which is universal, you have to give up on that form the Freedom of Exercise Clause that you'd otherwise have. Now, looked at that way, I don't think it matters whether they call themselves a corporation or whether they call themselves individuals. I mean, I think that's the question you're being asked, and I need to know what your response is to it. Well, I think our response is what the Court said in Part 3 of the Lee opinion, which is that once you make a choice to go into the commercial sphere, which you certainly do when you incorporate as a for-profit corporation, you are making a choice to live by the rules that govern you and your competitors in the commercial sphere. But even if you disagree with me about that, what I'd like to leave the Court with is what I think is the most important point here, is that if this exemption were granted, it will be the first time under the Free Exercise Clause or under RFRA in which this Court or any Court has held that an employer may be granted an exemption that extinguishes statutorily guaranteed benefits of fundamental importance. Lee came to exactly the opposite conclusion with respect to Social Security benefits, that it was imperative that the employees' interests be protected, and that is the fundamental problem with the position that my friends on the other side raise here, that they leave the third-party employees entirely out of the equation. But that's okay for not-for-profit corporations to do that with respect to all of their employees, and some of them are pretty big operations. That's okay there. No, we don't think that. We're not drawing a line between non-profits and profits. You allow them to make this religious objection? No. Religious non-profits get an accommodation in which their employees get the contraception, but we're not drawing a line between the four. But they don't have to pay for it, right? And you could set that up this way, that these people don't have to pay for it. Well, as I've said a couple of times, they haven't asked for that until this morning. The fundamental point here is that you would be extinguishing statutorily guaranteed health benefits of fundamental importance to these employees, and that is something that this Court has never done, and I submit that Congress can't have thought it was authorizing on an enacted RFRA in 1993. Thank you. Thank you, General. Mr. Clement, four minutes. Thank you, Mr. Chief Justice. Just a few points in rebuttal. Let me start with the abortion-conscious clauses, because it tells you something about where Congress has drawn the line, and it tells you the consequences of the government's decision. Historically, those conscious provisions have applied to all medical providers, including for-profit medical providers. But we learned today that as far as the government's concerned, that's just Congress's judgment. And if Congress changes its judgment and says that a for-profit medical provider has to provide an abortion, RFRA doesn't apply. That, with all due respect, cannot be what Congress had in mind when it passed RFRA. They also suggest that if a kosher market takes the trouble to incorporate itself, then it has no free exercise claims at all. Now, you can go back and read the Crown kosher case. I took it as common ground that all nine justices thought that if the Massachusetts law there had forced Crown kosher to be open on Saturday, that that would be a free exercise claim, notwithstanding the incorporation. The second point I want to talk about is least restrictive alternatives. In a colloquy with Justice Scalia, the Solicitor General points out that, yeah, well, it's a little bit different from the pre-Smith law, because now you have the less restrictive alternatives analysis. That's not a small difference. That's a major difference. And it's really the easiest way to rule against the government in this case, because you have a unique situation here where their policy is about a government, a subsidy for a government-preferred health care item, and the question is who pays. The government paying or a third-party insurer paying is a perfectly good least restrictive alternative. So we go back to the start of my question. That would be essentially the same for vaccines, blood transfusions, non-pork products. The government has to pay for all of the medical needs that an employer thinks or claims it has a religious exemption to. Not necessarily just the Sotomayor. It will depend on how you define it. Because those things are more important. No, not because they're more important. But the easiest way to distinguish them is that the government's already provided this accommodation for religious employers. Well, they make exemptions for vaccines, presumably, to some people on some basis. But we have a tax code that applies to everybody, but we have a million exemptions. Does the creation of the exemption relieve me from paying taxes when I have a sincere religious belief that taxes are immoral? No. I think Lee says that taxes are different and not all exemptions are created equal because some exemptions undermine the compelling interest. Now, the reason this — Isn't there a federal program that pays for vaccines for any children who are not covered by insurance for those vaccines? There is, Justice Alito. Of course, there's also Title X, which provides contraception coverage, which is another least restrictive alternative. But I do want to get on the table that it is not true that we have not suggested that the accommodation provided to religious employers like nonprofit hospitals, that's not something I invented at the podium. If you look at page 58 of our brief, the red brief, we specifically say that one of the least restrictive alternatives would be the most obvious least restrictive alternatives for the government to pay for their favorite contraception methods themselves. Later in that paragraph, the only full paragraph on the page, we say, and indeed the government has attempted something like that with respect to certain objecting employers, and we cite the Federal Register provision where there is the accommodation provision. Will your clients claim that filling out the form, you're saying they would claim an exemption like the churches have already? We haven't been offered that accommodation, so we haven't had to decide what kind of objection, if any, we would make to that. But it's important to recognize that as I understand that litigation, the objection is not to the fact that the insurance or the provider pays for the contraception coverage. The whole debate is about how much complicity there has to be from the employer in order to trigger that coverage. And whatever the answer is for Little Sisters of the Poor, presumably you could extend the same thing to my clients and there wouldn't be a problem with that. If I could have just one second more to say that the agency point that Justice Kennedy has pointed to is tremendously important because Congress spoke. It spoke in RFRA. Here the agency has decided that it's going to accommodate a subset of the persons protected by RFRA. In a choice between what Congress has provided and what the agency has done, the answer is clear. Thank you, Your Honor. Thank you, Counsel. Counsel, the case is submitted.